Filed 5/19/16  In re E.G. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re E.G., a Person Coming Under the Juvenile Court Law. | |
| KINGS COUNTY HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>                v.<br><br>R.G. et al.,<br><br>        Defendants and Appellants. | F072169<br><br>(Super. Ct. No. 14JD0169)<br><br>**OPINION** |

APPEAL from an order of the Superior Court of Kings County.  Jennifer Lee Giuliani, Judge.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant R.G.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant Y.A.

Colleen Carlson, County Counsel, and Risé A. Donlon, Deputy County Counsel, for Plaintiff and Respondent.

Darlene Azevedo Kelly, under appointment by the Court of Appeal, for Respondent, E.G.

-ooOoo-

Y.A. (mother) and R.G. (father) (collectively, the parents) separately appeal from an order terminating their parental rights to their son, E.G. (Welf. & Inst. Code, § 366.26.)[1] They contend the juvenile court erred by denying their petitions for modification requesting reunification services, and by finding the beneficial parental relationship exception did not apply to preclude termination of their parental rights. (§§ 388, 366.26, subd. (c)(1)(B)(i).) On review, we conclude the court properly exercised its discretion and affirm.

## PROCEDURAL AND FACTUAL HISTORY

### *Background*

The parents both have a long history of substance abuse. Mother, who was 26 years old at the time of the section 366.26 hearing, was only 13 years old when she began drinking alcohol and using drugs. She started with marijuana but quickly graduated to methamphetamine, and developed a habit of using methamphetamine on a regular basis.

Father, who was 32 years old at the time of the hearing, similarly started using drugs in his early teens, and developed a habit of using marijuana on a daily basis, and consuming approximately a quarter of a pound of marijuana each week. When he got tired of marijuana, he sometimes used methamphetamine, and he also tried cocaine once or twice.

By the time mother gave birth to E.G. in early December 2013, the parents' other two children together, E.G.'s siblings, were already in the dependency system. E.G.'s siblings were detained in January 2013, after the younger of the two was born with

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2.

symptoms including lethargy and lower jaw tremors and tested positive for methamphetamine. At the time, mother was on probation for drug-related offenses, and she had not yet completed any of her court-ordered treatment programs. The parents were not offered reunification services and their parental rights to E.G.'s siblings were eventually terminated, and the children were adopted in April 2014.

In addition, father had already lost custody of his other five children, E.G.'s half-siblings, due to his history of drug use. His parental rights were eventually terminated to all but one of the children who lived with his biological mother under a family maintenance plan. Mother also had two other children who were the subject of past child welfare referrals alleging general neglect. These two half-siblings of E.G. were never detained but lived with a maternal relative.

Although E.G. tested negative for drugs at the time of his birth in December 2013, mother tested positive for methamphetamine five months earlier during her pregnancy. In light of the parents' extensive history of substance abuse, the Kings County Human Services Agency (the agency) opened an investigative referral and offered them voluntary services under a 30-day safety plan. The parents' cooperation was minimal, however, and the agency closed the referral at the end of the requisite 30 days, after they tested negative for drugs.

### Present Dependency Case

On December 3, 2014, mother came to the agency under the influence of methamphetamine. After admitting she had smoked methamphetamine earlier that day and the day before, mother was arrested for being under the influence of a controlled substance. The agency opened another investigative referral and offered mother voluntary services under a 30-day safety plan.

However, father "adamantly" refused to work with the agency, and the agency thereafter learned that the parents had been leaving E.G. with "random" caregivers. Consequently, the agency placed E.G. in protective custody on December 22, 2014. The

3.

agency also filed a dependency petition on E.G.'s behalf under section 300, subdivision (b) (failure to protect) and subdivision (j) (abuse of sibling).

At an uncontested jurisdiction hearing in January 2015, the juvenile court found the allegations of the dependency petition to be true. Following a contested disposition hearing on March 24, 2015, the court followed the agency's recommendations and bypassed reunification services for the parents. (§ 361.5, subd. (b)(10) & (11)). The court then set the matter for a section 366.26 hearing on July 14, 2015.

### Section 366.26 Report

In the report prepared for the section 366.26 hearing, the agency recommended that the juvenile court terminate parental rights and establish a plan of adoption. The agency stated that E.G.—a healthy one year old, without developmental or medical concerns—was an excellent candidate for adoption, and that his current caretaker—a married 53-year-old homemaker—was committed to adopting him if parental rights were terminated.

The agency noted that, although the caretaker wished to adopt E.G. on her own, her husband was "fully supportive" and "in agreement" with the adoption. The agency also noted that the caretaker's family had "welcomed E.G. into their home and the emotional ties between the child and the family continue[] to grow."

The agency further reported that the caretaker's home was already a "Resource Family Approved (RFA) home, approved by the agency" and that she "provides foster care for dependent children in foster care placement." This was also the caretaker's second application for adoption, after having adopted her two grandchildren through the agency in November 2013.

Regarding the history of contacts between E.G. and his parents, the agency reported that the parents attended all their scheduled visits, the visits had all gone well, with the parents engaging actively and appropriately with E.G., and the family appeared to enjoy their visits together.

Toward the end of its report, the agency briefly summarized the parents' prior child welfare and substance abuse history and the circumstances of their current dependency case. The agency also noted that the parents failed to complete their two 30-day safety plans concerning E.G., under which the agency had offered them voluntary services, the first time after E.G.'s birth in early December 2013, and the second time, after mother admitted to using methamphetamine in early December 2014.

After pointing out that E.G. appeared to be adjusting well in his foster home, where he had lived since he was taken into protective custody on December 22, 2014, the agency concluded: "Based on E.G.'s tender young age, it is felt that providing the child with permanency and stability under the plan of adoption is in the child's best interest."

### *Section 388 Petitions*

Several days prior to the section 366.26 hearing, the parents separately filed section 388 petitions requesting reunification services, and the hearing was subsequently continued to August 11, 2015. Mother supported her petition with documentation showing that, since the court's denial of reunification services in March 2015, she had completed one parenting class and was soon to finish a second, she was making excellent progress in her outpatient substance abuse treatment program, in which she enrolled in January 2015, each of her 10 drug tests in the program had come back negative, and she was regularly attending Alcoholics Anonymous /Narcotics Anonymous (AA/NA) meetings.

Regarding the question of why the requested reunification services would be better for E.G. than the court's previous order, mother asserted:

> "Here, the mother has completed myriad programs and services in order to alleviate and/or mitigate the causes necessitating [E.G.'s] initial placement in out of home care. Based on [mother's] history with Child Protective Services and her failure to reunify with [E.G.'s] sibling, [mother] was bypassed for services and Family Reunification Services were not ordered in the instant case. As the Exhibits show, she has engaged in services on her own in an effort to change and she has.… Based on the completion of

5.

these services, and the progress made by [mother], it would be in the best interest of the minor to order Family Reunification Services for [mother] and E.G."

For his part, father supported his section 388 petition with documentation showing that he was participating in a parenting class in which he enrolled on May 11, 2015, he had completed an anger management support group, and he was attending AA/NA meetings and making progress in his outpatient substance abuse treatment program.

Father asserted the requested reunification services would be better for E.G. because father was "now able to provide a stable, loving and drug free home for E.G." and "[i]t would therefore be in the child's best interest to provide Family Reunification Services to him with the goal of having E.G. eventually placed in his care."

***Response to Section 388 Petitions***

On August 10, 2015, the agency filed a report responding to the parents' section 388 petitions, recommending that the juvenile court deny the petitions and continue with the permanent plan of adoption. The agency observed that E.G. was comfortable with his current caretakers, and that the caretakers had demonstrated their emotional and financial ability to care for E.G. and meet his developmental needs. The agency further observed that the caretakers were "determined to commit to a permanent plan of adoption for the child."

The agency's report included a detailed summary of the parents' prior dependency cases, and reiterated the fact that E.G. was father's eighth child to have been removed from his care, and mother's third child to have been removed from hers, due to their extensive history of drug use and failure to complete preventative safety plans.

As to the current dependency case, the agency noted that, after mother admitted that she and father had been smoking methamphetamine and she was arrested on December 3, 2014, father was noncompliant in meeting with the social worker to establish a 30-day safety plan, and he avoided the agency on numerous subsequent occasions. Around that time, mother reportedly advised the agency that father was not

6.

attending his treatment classes due to his work schedule, and before the agency took E.G. into protective custody on December 22, 2014, mother advised the agency that, since November 21, 2014, E.G. had been living not with the parents but with relatives in Avenal, California.

Concerning mother's recent rehabilitation efforts, the agency reported that mother received a certificate for completing one parenting class on May 11, 2015, and that on June 15, 2015, she enrolled in a second parenting class. Mother also enrolled in an outpatient substance abuse treatment program on January 8, 2015, and had 10 negative urine tests in that program. The agency acknowledged that mother was "highly engaged in her parenting and outpatient programs" and noted that her substance abuse counselor had reported that she was expected to successfully exit the program in the next few weeks, and that her parenting counselor reported that she was compliant and making good progress in her parenting class.

Despite these recent efforts, the agency observed, mother had only received about two months of outpatient services in contrast with her "long history of drug use starting at the age of thirteen." The agency concluded that two months of sobriety failed to "provide a dependable timeframe to determine [mother's] capability to provide efficient care to her son."

The agency further noted the parents had never enrolled in a program to address "any unresolved issues" they might have with one another, which was a concern to the agency because mother had previously disclosed that she and father would argue, and that it was because of their arguing and fighting, that she had felt pressured into using methamphetamine. She had also disclosed that, because of her arguments with father, she had obtained the methamphetamine from a neighbor, and that father blamed her for their losing custody of E.G.

Regarding father's recent rehabilitation efforts, the agency stated that, although he enrolled in parenting classes on May 11, 2015, three months of parenting cases was an

insufficient amount of time to "rationalize" his current and prior dependency cases. The agency added that the progress report from father's outpatient substance abuse program reflected that three of his urine tests had come back positive for marijuana. Father reportedly told his substance abuse counselor that the June 22, 2015 drug test came back positive because he had been "present at the time marijuana was being smoked, but he did not smoke."

Concerning the parents' relationship with E.G., the agency reported that since the case had transferred to permanency planning in April 2015, mother and father had attended their four monthly supervised visits with E.G., and that the visits went well. The parents both interacted appropriately with E.G. and the visits were "very positive and playful." Nonetheless, the agency concluded that it was still in E.G.'s best interests to remain with his current caregivers and continue with the permanent plan of adoption. The agency briefly summarized the reasons for this conclusion as follows:

> "[T]he parents are participating into programs to address their drug uses and their parenting, but the parents [have] not enrolled into any couple counseling or domestic violence programs to address the issues they may have with communicating with each other. In addition, [father] had three positive urine drug tests for marijuana. In regard to his most recent test on June 22, 2015, [father] told his [substance abuse] counselor that he did not smoke, but was present when someone was smoking marijuana. [¶] On July 27, 2015, the parents provided the Agency with a negative hair follicle drug test. Even though the test results were negative and the parents have participated in parenting classes, [mother] and [father], have not provided a consistent record of sobriety from drug substance. The parents also have not provided a consistence timeframe that they can appropriately parent their child. The several months of parenting classes cannot excuse their actions regarding their current and prior child welfare history."

### Combined Hearing

On August 11, 2015, the juvenile court held a combined section 388 and section 366.26 hearing. Mother and father both testified at the hearing, describing their recent

efforts to recover from their chronic substance abuse, which were consistent with the efforts described in the parents' section 388 petitions and in the agency's reports.

Additionally, mother explained that she tried to enroll in her substance abuse treatment program on December 6, 2014, but was placed on a waitlist at that time, which was why she did not enroll in the program until January 2015. In her testimony, mother also stated that she had learned from her programs the importance of having a support system and remaining connected with people who helped her stay sober, and identified the individuals she considered to compose her personal support system. Mother confirmed she had been sober for a little over eight months, and estimated that her longest period of sobriety prior to that lasted around two years and occurred when she was around 18 years old.

Mother believed that granting reunification services would benefit E.G.:

"Because I believe I have changed. I believe that this time around it's different, my—my mindset is more different. I'm more concentrated on being sober, I'm more concentrated on doing the right thing for not just myself but for my son and for my other kids. Since then I have been talking to my other children that I have, the ones that got adopted out as well as my oldest ones. I try and visit them as much as they allow me to and talk to them and I'm around as much as I can be. And I'm trying to be a better mom, that's exactly why I've been going to parenting classes, why I'm taking another parenting class, why I'm trying to show—show that I can be that better mom that I want to be."

In his testimony, father stated that he tried to attend AA/NA meetings twice a week, confirmed he had a sponsor in that program, and demonstrated his ability to recite "the serenity prayer." Father said he paid close attention to what other members said during the meetings because many of them had been "clean" for over 50 years and knew what they were talking about, and he wanted to "grab the tools" they had used to stay sober.

9.

Father confirmed that he was currently working full-time as a field laborer at a local farm, where he had been working for the past six months. He could not recall when he last smoked marijuana, but thought that he stopped when the court told him to.

In testifying about what he had learned from his anger management class, father admitted that he often found himself feeling angry, in part, because of his cousin's murder in 2014, and also because he missed his family, explaining that he had been "so high" they had stayed away from him for many years, beginning when he was around 23 or 24 years old.

Father also described in his testimony his love for E.G. and their positive visits together. Father estimated that E.G. had lived with him and mother for about 10 or 11 months from the time he was born until about a month before he was detained. During that time, father worked and paid the rent and for everything else E.G. needed, including diapers and bottles. Father would also hold E.G. and put the child to bed at night. During supervised visits, E.G. was affectionate with father, and he referred to his parents as "mom" and "dad."

E.G.'s adoption social worker, Lupe Montes, also testified at the hearing. Montes confirmed that E.G. was placed in a suitable home and that his caretakers were "definitely" interested in adopting him if parental rights were terminated. But even if they became unable to adopt for some reason, Montes opined, it would not be difficult to find an adoptive placement for E.G. given all of his positive qualities.

According to Montes's testimony, E.G. was very attached to his caretakers and called them "mama" and "papa." While there was "definitely" a bond between E.G. and his parents, there was also a bond between E.G. and his caretakers, with whom he was "very close." Montes opined that, due to his extremely young age, E.G. needed and could find permanency and stability in his current placement.

Following argument by the parties, the juvenile court denied the parents' section 388 petitions, expressly finding "there has not been a change of circumstances" and

10.

E.G.'s best interests were "not promoted" by the requested order of reunification services. The court's rationale for so finding is reflected in the following excerpts taken from the court's extensive and thoughtful comments at the conclusion of the August 11, 2015 hearing:

> "[T]here's no question in my mind that the parents' circumstances are changing, they are learning to live drug free. But I don't believe that six months or eight months of sobriety and a few months of treatment is a changed circumstance. I think that it is changing."

> "[B]ut even if I could find that there had been changed circumstances, I don't have enough information that came out in testimony today that would convince me that it is in E.G.'s best interest to change the order."

> "So the two prong test as far as the evidence that was presented with the Court is lacking as far as best interest. When we talk about an 18 month old child, and we're talking about the—the child having been with the parents for the first year or so if his life and then going to a different care provider for seven or eight months after that. We have a situation where the testimony has been provided that the child has bonded with both sets of the parents and the caretaker, but I don't have anything … which I can infer from the parents' testimony that … you think it's in your child's best interest to be raised by his parents. And, again, the case law is pretty clear that that's not going to be enough because everybody, every single person who comes to this courtroom as a parent will say or believes that the child should be raised by his parents, the child should be raised by family, the child should be raised by parents. And I think that there is some thought that in the beginning when we are talking about services being offered, there's a really strong emphasis on the services being offered so that … we can maintain the family, and that's exactly what those are designed for. But when we are talking about the—there being no services or services being terminated, the law shifts and the legislative preference for keeping families together shifts to permanency and stability for the child."

> "So the law says what I'm supposed to do is be focusing on the stability and permanency of a child and what comes secondary to that is preserving the family and preserving the child with the family."

> "So with that the Court is going to … commend you on the things that you have done to get yourself on track. But at least at this stage in time a few months of services and a few months of sobriety with the history that you

11.

have is certainly not going to be sufficient for the Court to find changed circumstances."

The juvenile court also found that the beneficial parental relationship exception of section 366.26, subdivision (c)(1)(B)(i) did not apply:

> "I have not received a factual basis or any facts that would suggest that one of the enumerated exceptions … would apply in this case. Probably the closest thing that we would get would be that severing the bond, the parental bond between the child and the parents would be detrimental and not serve the child's best interest. I don't have testimony with regard to that such that I can make that finding as well."

The court then determined by clear and convincing evidence that E.G. was likely to be adopted and terminated parental rights.

## DISCUSSION

### *Introduction*

As mentioned above, the parents challenge the juvenile court's denial of their section 388 petitions requesting reunification services and the rejection of their claim that the beneficial parental relationship exception applied to preclude termination of their parental rights to E.G. The parents in essence argue that there was uncontradicted evidence in the record favorable to their requests and therefore the court erroneously found they failed to establish either that their circumstances had changed or that they shared a beneficial relationship with E.G. such that termination would be detrimental to him.[2]

---

[2]     Although the parents frame their supporting arguments somewhat differently in their separate briefs on appeal (and mother joins in father's arguments to the extent they benefit her), their arguments effectively challenge two juvenile court actions that we conclude are both reviewable under the deferential abuse of discretion standard. In so concluding, we necessarily disagree with father's claim that the juvenile court's finding regarding the beneficial parental relationship exception is reviewable under the substantial evidence test, as well as disagree with his negative criticism of certain language in well-established case law regarding application of the relevant benefit exception, which guides our conclusion that the juvenile court did not abuse its discretion in finding the exception did not apply in this case.

As discussed below, however, favorable evidence in the record does not entitle the parents to reversal. The fact is that the parents faced stiff legal hurdles. First, they bore the burden, as to each request, of persuading the juvenile court to exercise its discretion (*In re Audrey D.* (1979) 100 Cal.App.3d 34, 43; *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343); thus, to the extent the record is silent on any point, that is a problem of the parents' making, not the court's or the agency's. Further, issues of fact and credibility are matters for the juvenile court. (*In re Laura F.* (1983) 33 Cal.3d 826, 833.)

Second, at this late stage of the dependency proceedings, the focus had shifted from family reunification to the child's needs for permanency and stability. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) Indeed, because it was undisputed E.G. was adoptable, termination of parental rights and adoption were presumed to be in his best interests. (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) Thus, in hearing the parents' requests, the court was required to recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*) and the parents had to rebut that presumption.

Similarly, on appeal, it is the parents' burden to show the juvenile court clearly abused its discretion—that is, exceeded the bounds of reason—in denying their requests. (*Stephanie M., supra*, 7 Cal.4th at p. 318; *In re Lorenzo C., supra*, 54 Cal.App.4th at p. 1339; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.) When two or more inferences can reasonably be deduced from the facts, we as the reviewing court have no authority to substitute our decision for that of the trial court. (*Stephanie M., supra*, 7 Cal.4th at p. 319.)

It is against this legal backdrop that we conclude on our review of the record and the relevant law that the court did not err in reaching the conclusions it did. This result is in no way intended to demean the parents' efforts to turn their lives around. Instead, it simply acknowledges that despite their efforts, the law did not entitle the parents to the relief they sought and the court did not abuse its discretion in denying them such relief.

13.

***Section 388 Petitions***

While a parent may petition the court to modify a prior order on grounds of change of circumstance or new evidence, the parent must also show that the proposed change would promote the best interests of the child. (§ 388, subds. (a)(1), (b)(1); Cal. Rules of Court, rule 5.570(h).) Having reviewed the record, as summarized above, we fail to see how the parents established an order of reunification services would be in E.G.'s best interests, that is, it would advance his need for continuity and stability. (*Stephanie M., supra*, 7 Cal.4th at p. 317.)

The parents urge this court to apply factors legislated by the appellate court in *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 530-532 (*Kimberly F.*) to evaluate E.G.'s best interests. Those factors identified by the appellate court are: the seriousness of the problem leading to dependency and the reason that problem was not overcome; the strength of relative bonds between the dependent children to both parent and caretakers; and the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been. (*Ibid.*)

"[W]e decline to apply the *Kimberly F.* factors if for no other reason than they do not take into account the Supreme Court's analysis in *Stephanie M.*, applicable after reunification efforts have been terminated. As stated by one treatise, 'In such circumstances, the approach of the court in the case of … *Kimberly F.* … may not be appropriate since it fails to give full consideration to this shift in focus.' [Citation.] We instead follow the direction of our Supreme Court [in *Stephanie M.*], holding that after reunification services have terminated, a parent's petition for either an order returning custody or reopening reunification efforts must establish how such a change will advance the child's need for permanency and stability." (*In re J.C.* (2014) 226 Cal.App.4th 503, 527 (*J.C.*).)

Like the mother in *J.C.*, the parents in this case failed to present any evidence establishing that E.G.'s best interests in permanency and stability would be furthered by

14.

the proposed modification under the analysis of *Stephanie M.* (*J.C., supra*, 226 Cal.App.4th at p. 527.) Instead, in invoking the *Kimberly F.* factors, the parents are essentially claiming it was in E.G.'s best interests to preserve the parent-child relationship the parents diligently worked to achieve during the months leading up to the section 366.26 hearing. (*J.C., supra*, at pp. 526-527.) However, at this stage in the proceedings, E.G.'s best interests were not to delay further permanency and stability in favor of rewarding the parents for their hard work and efforts to reunify; the parents' best interests were simply not the focus. (*Id.* at p. 527.)

### *No Detriment*

The parents no doubt established they maintained regular visitation with E.G. throughout his dependency and they enjoyed a happy relationship. However, even assuming proof that E.G. had a significant emotional relationship with the parents, such a showing did not compel the juvenile court to find that termination would be detrimental to E.G.

Section 366.26, subdivision (c)(1)(B) requires the juvenile court to terminate parental rights if it finds by clear and convincing evidence that a child is likely to be adopted, unless "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" due to an enumerated statutory exception. The "beneficial parental relationship" exception of section 366.26, subdivision (c)(1)(B)(i) requires a showing of "regular visitation and contact" and "benefit" to the child from "continuing the relationship." "To meet the burden of proof, the parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 229.) The parent must establish the existence of a relationship that promotes the child's well-being to such a degree as to outweigh the well-being the child would gain in a permanent home with adoptive parents. (*In re Jason J.* (2009) 175 Cal.App.4th 922, 936.)

15.

"A juvenile court must therefore: 'balance[] the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.'" (*In re Lorenzo C.*, *supra*, 54 Cal.App.4th at p. 1342.)

Here, no such evidence was introduced. In addition, the juvenile court did not have to ignore the fact that E.G. was very young and faced the possibility of tenuous placement for the balance of his childhood if parental rights were preserved. We therefore conclude the court properly exercised its discretion in rejecting the parents' claim.[3]

## DISPOSITION

The order terminating parental rights is affirmed.

_____
LEVY, Acting P.J.

WE CONCUR:

_____
DETJEN, J.

_____
FRANSON, J.

_____

[3]     To the extent father's argument on appeal seems to fault the agency for failing to present evidence establishing that E.G. was better off with his prospective adoptive family than with father and mother, we reiterate the law presumed E.G. would be better off in an adoptive placement. It was up to the parents to prove otherwise. Such proof is not, as father suggests, furnished by comparing positive traits of the parents with negative characteristics (e.g., "ambivalent" and "advanced age") father attributes to E.G.'s caretakers based on a subjective interpretation of biographical details in the agency's reports.